**UNITED STATES of America, Plaintiff–Appellant,**

**v.**

**ONE 1974 LEARJET 24D, SERIAL NUMBER 24D–290, MEXICAN REGISTRATION XA–RMF, including all aircraft logbooks, registration and title documents, and all appurtenances thereon, Defendant–Appellee,**

Francisco Jaime Madrid, Defendant.

No. 98–5080.

United States Court of Appeals,
Sixth Circuit.

Submitted: Dec. 10, 1998

Decided and Filed: Sept. 17, 1999

David Y. Olinger, Jr., Assistant U.S. Attorney (briefed), Lexington, Kentucky, for Plaintiff–Appellant.

Milton Coburn Toby (briefed), Perch & Toby, Lexington, Kentucky, for Defendant–Appellee.

Before: BOGGS and MOORE, Circuit Judges; and DOWD,* District Judge.

## OPINION

BOGGS, Circuit Judge.

The United States seized a Learjet and appeals the dismissal of its in rem forfeiture complaint seeking the issuance of an arrest warrant for the aircraft and the forfeiture of the plane. We reverse.

### I. Background

On May 28, 1997, agents at the El Paso Intelligence Center (EPIC) of the Drug Enforcement Administration learned that a Learjet, model 24D, serial number 24D–290, with Mexican registration XA–RMF ("the jet"), had landed in Brownsville, Texas. On one Customs form, the pilot, Jaime Madrid–Sanchez, listed the owner as the Mexican company AEROJAL. On another form, Madrid–Sanchez listed the owner as the Mexican company AEROTONALA. The pilot named Lexington, Kentucky, as the jet's destination.

That same day, DEA Special Agent G. Courtney of the DEA's Phoenix office contacted Kenneth Armstrong, a "Task Officer with the DEA," employed by the Lexington–Fayette County police department. Courtney told Armstrong that confidential sources had informed the DEA that AEROJAL and AEROTONALA were sham businesses run by Ramiro Mireles–Felix and Sergio Fierro–Chavez, respectively.

Courtney said that American and Mexican law enforcement agents considered Mireles–Felix a "top level cocaine and marijuana trafficker" who "has used aircraft to smuggle illegal drugs into the United States." Courtney also said that, in May 1996, he had personally seized a luxury yacht registered to Fierro–Chavez, based on its relation to illegal drug trafficking. DEA records also showed that, in 1995, officials seized an aircraft registered to Fierro–Chavez and containing 228 kilograms of cocaine.

Courtney warned Armstrong that a "reliable confidential source" fingered Madrid–Sanchez as the owner of AEROTONALA, and as an employee of an "unknown company" that "conceal[s] corporate jets for drug traffickers." Courtney suggested that Armstrong examine the plane after it arrived in Lexington. That day, the plane landed at Bluegrass Field, piloted by Madrid–Sanchez. FAA records list the aircraft as purchased in 1990 by AEROJAL, and leased to AEROTONALA since 1994.

Armstrong confirmed the plane's arrival. Armstrong is a trained canine handler, and he went to the jet with "Robby," a certified drug detection dog. On May 28, the day of arrival, Robby alerted to an odor "emanating from the aircraft." Based on this evidence, Armstrong applied for and received a warrant to search the aircraft for drugs and drug paraphernalia. A Fayette County district judge issued the warrant that day.

Armstrong returned to the plane that night and executed the warrant. According to Armstrong, inside the plane, officers recovered "marijuana residue on the rear passenger carpet area." Under the carpet, they discovered recently-moved metal floor panels covering a cargo space. DEA Special Agent Eiseman told Armstrong that drug smugglers often conceal drugs in cargo spaces such as that covered by the

---

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

panels. Robby alerted to the passenger floorboard area, although the affidavit does not say that he alerted within the cargo space.

On May 29, Armstrong interviewed the pilot, who claimed that he purchased the plane in 1994 for $500,000 from a Mexican bank whose name he could not recall. Madrid–Sanchez denied knowledge of Mireles–Felix or Fierro–Chavez, claimed to be the president of AEROTONALA, and denied knowing about any seizures of that company's aircraft. While searching the plane, however, Armstrong found documents and business cards concerning a different Learjet, also used by AEROTONALA, that DEA agents seized in 1995 in McAllen, Texas. Also on May 29, a United States Magistrate Judge issued to Armstrong a "seizure warrant" for the plane. The DEA seized the plane.

Two days later, Courtney told Armstrong that all telephone numbers listed to AEROTONALA were no longer in service, and Armstrong confirmed this. Courtney also informed Armstrong that American and Mexican law enforcement officers had previously interviewed Madrid–Sanchez, who admitted working for Fierro–Chavez and who revealed personal financial information that suggested Madrid–Sanchez could not personally afford to operate, let alone purchase, a Learjet.

Two weeks later, on June 12, 1997, the United States filed a verified complaint of forfeiture in rem, to which it attached Armstrong's affidavit presenting evidence to support the forfeiture. The government brought the civil action under 21 U.S.C. § 881(a)(4) and (a)(6), which permit the forfeiture of the property and proceeds of property used or intended to be used to transport or facilitate the transportation of illegal drugs. The government asked the district court to issue an "arrest warrant" for the jet, to hold a show cause hearing regarding the forfeiture, and to enter judgment forfeiting the jet to the United States.

According to Madrid–Sanchez, at some point, the DEA gave a Notice of Seizure, based on the seizure warrant, to Madrid–Sanchez's co-pilot, DeAnda Navarro Guillermo, who forwarded the documents to Madrid–Sanchez. Madrid–Sanchez's attorney claims that he is authorized to accept service of process, but that neither his law firm nor Madrid–Sanchez has received service of process or formal notice of the forfeiture proceeding.

On August 29, 1997, Madrid–Sanchez moved pursuant to Federal Rule of Criminal Procedure 41(e) for an order directing the United States to return the jet and the documents within.[1] The motion, written by counsel and not signed by Madrid–Sanchez, claimed that Madrid–Sanchez owned the jet and operated a legitimate air taxi service based in Guadalajara, and that the continued retention of the jet caused the business irreparable harm. The attorney attached a receipt of some kind, in Spanish, containing the names AEROJAL and AEROTONALA; the receipt does not link Madrid–Sanchez to the jet or to either of the two companies. The memorandum in support of the motion alleged that Madrid–Sanchez had provided the United States Attorney with incorporation documents and payroll tax documents for AEROTONALA, although neither party included these documents in the Joint Appendix.

On September 12, 1997, the United States responded, asserting that it had probable cause when it obtained the seizure warrant. The response further argued that Rule 41(e) did not apply to civil forfeiture actions, and that the government had established probable cause to retain the jet and obtain an arrest warrant. On September 23, 1997, Madrid–Sanchez's attorney filed a reply that included two exhibits purporting to show that the cargo

---

1. Rule 41(e) provides, *inter alia,* "A person aggrieved by an unlawful search or seizure or by the deprivation of property may move the district court ... for the return of the property on the ground that such person is entitled to lawful possession of the property."

space was built into the jet by the manufacturer, and was thus not a modification intended to conceal drugs. The attorney also claimed that Madrid–Sanchez was "prepared to testify" that he once leased the other, forfeited, Learjet, but that he returned it to its owner several months before the DEA seized the plane. The reply observed that the government had not offered a laboratory test identifying the residue as marijuana, and it suggested that a third party may have introduced the marijuana after the landing but before the search.

On November 7, 1997, the district court issued an opinion and order, in which it declined to consider the Rule 41(e) motion. The court held that the government failed to establish probable cause to believe that the jet was used or intended to be used to transport narcotics. The court found that the government failed to buttress its hearsay evidence with anything other than weak, circumstantial evidence of drug transportation. The court ordered a judgment for the jet, ordered it returned to its owner, and dismissed the matter with prejudice. The United States appealed.

## II. Disposition

### A

We hold that the district court erred by sua sponte dismissing the case and by ruling that the government lacked probable cause to seize the aircraft. The procedural posture of the case did not permit the district court to dispose of the forfeiture complaint in this manner. Confusion arises because of the interplay between the seizure of a res and the initiation of forfeiture proceedings against a res.

In May 1997, the government obtained a seizure warrant and seized the plane. The government did not initiate forfeiture proceedings until June 12, 1997, however. The seizure (and seizure warrant), the arrest warrant, and the attempted ultimate forfeiture each implicate different bodies of law, have different goals, and require different evaluations of probable cause. In the instant action, the government believed that the Learjet's owner used the aircraft to transport illegal drugs. 21 U.S.C. § 881(a)(4) permits the forfeiture of aircraft used, or intended for use, to transport controlled substances. When the government has probable cause to believe that an item is subject to civil forfeiture, § 881(a)(4) authorizes seizure of the property *for safekeeping* pending the outcome of the forfeiture proceeding—the seizure prevents the owner from evading the forfeiture law by transferring title or absconding with the property. *See, e.g., United States v. Real Property Known and Numbered as Rural Route 1, Box 137–B, Cutler, Ohio,* 24 F.3d 845, 849–50 (6th Cir.1994).

Although the statute permits the government to seize property when "the Attorney General has probable cause to believe that the property is subject to civil forfeiture," 21 U.S.C. § 881(b)(4), some courts have held that the Fourth Amendment permits seizure under § 881(b) only when a judicial officer issues a warrant. *See, e.g., United States v. One Hundred Twenty–Eight Thousand Thirty–Five Dollars ($128,035.00) in U.S. Currency,* 628 F.Supp. 668, 671–73 (S.D.Ohio 1986) (discussing seizure of real property, however, and distinguishing the seizure of mobile personal property such as automobiles), *appeal dismissed,* 806 F.2d 262 (6th Cir. 1986) (table). Thus, government actors will sometimes, as they did here, abstain from seizing property until they obtain a warrant from a judicial officer.[2] When the

---

2. In the instant case, before seizing the Learjet, the government obtained a warrant from a judicial officer, so we do not decide today whether the Fourth Amendment requires the government to obtain a warrant from a judicial officer before seizing property that the

government believes is subject to forfeiture. We approve of the government's behavior of obtaining a warrant in this case, however, and observe that—at least in the absence of exigent circumstances—prudent law enforcement officials will continue to obtain war-

government asked for a warrant to seize the Learjet, it had to show probable cause "adequate to justify holding the property pending the dispositive evidentiary hearing. In other words, ... that the government had made an adequate *preliminary showing* that the property was connected to illegal activity, and thus forfeitable." *Rural Route 1*, 24 F.3d at 850 (quoting *United States v. Parcels of Real Property*, 795 F.Supp. 1225, 1231–32 (D.Mass.1992), *aff'd*, 9 F.3d 1000 (1st Cir.1993)) (emphasis added).

The May showing of probable cause— probable cause *to seize the plane*—occurred ex parte. After the seizure, Madrid–Sanchez attempted to use the equitable remedy of Federal Rule of Criminal Procedure 41(e) to challenge the ex parte finding of probable cause. Rule 41(e) provides that:

> A person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court for the district in which the property was seized for the return of the property on the ground that such person is entitled to lawful possession of that property. The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be returned to the movant, although reasonable conditions may be imposed to protect access and use of the property in subsequent proceedings.

FED.R.CRIM.P. 41(e). The district court did not consider the Rule 41(e) motion.

■ We note that, had the district court granted the Rule 41(e) motion, the district court still could not have relied on that ruling to dismiss the forfeiture proceedings. A lack of probable cause to seize the plane would permit its return to its owner, but would not, by itself, have ended the forfeiture proceedings. "[R]easonable conditions may be imposed to protect access

rants from judicial officers before seizing property that the government believes is sub-

and use of the property in subsequent proceedings," FED.R.CRIM.P. 41(e), such as forfeiture proceedings. "[E]ven when the initial seizure is found to be illegal, the seized property can still be forfeited," however. *United States v. Daccarett*, 6 F.3d 37, 46 (2d Cir.1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 648 (1994). "Absence of probable cause at the time of the seizure may result in the suppression of evidence in later proceedings, but the defendant property itself cannot be suppressed from the forfeiture action. In contrast, a failure to establish probable cause on the forfeiture issue will preclude forfeiture of the property altogether." *Ibid.* (citation omitted).

■ After the government initiates forfeiture proceedings and notifies a claimant of the proceedings, a claimant may no longer use Rule 41(e), but instead must submit to the statutory procedures governing civil forfeiture proceedings. *See Shaw v. United States*, 891 F.2d 602, 603–04 (6th Cir.1989). In the instant case, the district court dismissed the forfeiture complaint (and, apparently, an arrest warrant did not issue), finding that "there is no probable cause for the seizure of Defendant aircraft." As the previous paragraphs establish, however, such a finding improperly conflates the probable cause necessary to seize the plane with the probable cause that requires forfeiting the plane. *See, e.g., Rural Route 1*, 24 F.3d at 849–50. The latter determination asks "whether there is probable cause to forfeit defendant property." *Id.* at 849. Not only do the two probable cause determinations involve different queries, they also may involve different evidence. In *United States v. $67,220.00 in United States Currency*, 957 F.2d 280 (6th Cir.1992), we held that courts should decide whether probable cause exists to forfeit the property based on the government's evidence at the time

ject to forfeiture.

of the forfeiture proceeding, rather than on the evidence at the time of seizure. *See id.* at 284.[3]

■ In its final order, the district court erred by focusing on probable cause to seize the plane, rather than on probable cause to forfeit the plane. Further, the government's complaint need not demonstrate probable cause to forfeit the property. The complaint need only contain "facts sufficient to support a reasonable belief that the government *could demonstrate* probable cause for finding the property tainted." *United States v. Real Property Located at 2323 Charms Road, Milford Township, Oakland County*, 946 F.2d 437, 441 (6th Cir.1991) (quotations and internal quotation marks omitted) (emphasis added). The district court erred by requiring the government's complaint to show probable cause, rather than a reasonable belief that, *at the forfeiture trial*, the government could prove probable cause. Finally, we observe that the district court appears to have sua sponte dismissed the case on the merits without providing notice to the government, in violation of the rule of *Tingler v. Marshall*, 716 F.2d 1109, 1112 (6th Cir.1983).

■ Thus, we reverse the judgment of the district court and remand for further proceedings. Upon remand, the district court should first resolve the parties' dispute over whether the government properly served or notified Madrid–Sanchez of the forfeiture complaint. If the government erred and has not provided official notice of the seizure and civil forfeiture proceedings, Madrid–Sanchez may still employ Rule 41(e) to obtain the return of the plane (but not the dismissal of the forfeiture proceeding). *See, e.g., Shaw*, 891 F.2d at 603–04. If, on the other hand, the government properly gave notice, the district court should proceed to resolve the

questions surrounding the complaint seeking forfeiture.

■ On remand, the district court should comply with the dictates of Supplemental Rule for Certain Admiralty and Maritime Claims C(3) concerning the issuance of an arrest warrant. *Cf. Republic Nat'l Bank v. United States*, 506 U.S. 80, 82, 84–85, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992) (discussing the prerequisites for initiation of an in rem civil forfeiture proceeding). Pursuant to Supplemental Rule C(6), Madrid–Sanchez has the opportunity to file a claim after the execution of process. *See United States v. One Assortment of Eighty–Nine Firearms and Six Hundred and Thirty–Eight Rounds of Ammunition*, 846 F.2d 24, 26–27 (6th Cir. 1988). In its complaint, the government need only comply with the holding in *Charms Road* and allege facts sufficient to support a reasonable belief that the government could demonstrate probable cause at trial. On remand, if the district court believes that the government satisfies this burden, it should proceed to resolve the forfeiture proceedings on the merits. At trial, the government may introduce evidence of probable cause to forfeit, even if it did not have the evidence when it applied for the seizure warrant. *See $67,-220.00 in U.S. Currency*, 957 F.2d at 284. Finally, the district court may not again dismiss the case sua sponte, unless it affords the government proper notice and an opportunity to respond.

B

The judgment of the district court is REVERSED and the action is REMANDED for further proceedings consistent with this opinion.

---

**3.** Because the Circuit Courts of Appeal differ in their approach to admitting evidence in forfeiture proceedings, parties should exercise caution in presentation of citations in their filings to this court and the district court.

*See, e.g., United States v. $9,041,598.68*, 163 F.3d 238, 247 & n. 7 (5th Cir.1998) (discussing circuit split), *cert. denied*, —— U.S. ——, 119 S.Ct. 2369, 144 L.Ed.2d 773 (1999).